Ethan A. Brecher, Esq.
Law Office of Ethan A. Brecher, LLC
600 Third Avenue, 2nd Floor
New York, NY 10016
*Attorney for Appellant Mary A. Ortegon*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Civil Action No. 14-08680-VEC<br><br>On Appeal from<br><br>Case No. 08-01420 (SCC) |
| MARY A. ORTEGON,<br><br>APPELLANT,<br><br>v.<br><br>JAMES W. GIDDENS, as Trustee for the<br>SIPA Liquidation of Lehman Brothers Inc.,<br><br>APPELLEE. | **BRIEF OF THE APPELLANT** |

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................................... 1

STATEMENT OF THE ISSUE.................................................................................... 1

STATEMENT OF THE CASE .................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

STANDARD OF REVIEW ........................................................................................ 8

ARGUMENT ........................................................................................................ 9

I.    Ortegon and LBI Executed a Valid Employment Contract ...................................... 9

II.    Ortegon Was a LBI Employee ......................................................................... 12

III.    Ortegon Is Due Bonus Compensation Per the Terms of the Contract ............................. 13

    A.  The Contract Contains No Active Employment Requirement For The Bonus ............. 14

    B.  Ortegon Was Not Terminated For Cause...................................................... 16

CONCLUSION...................................................................................................... 18

# TABLE OF AUTHORITES

## CASES

*Amies v. Wesnofske*, 255 N.Y. 156, 174 N.E. 436 (1931) .............................................................. 12

*Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22  (S.D.N.Y. 2010) ................................................11

*Arneauld v. Pentair, Inc.*, 2012 WL 5932956 (E.D.N.Y. Nov. 26, 2012) ...................................... 17

*Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342 (S.D.N.Y. 2013) ................................... 12

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994) ........................ 9

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76 (2d Cir. 2002). .................... 15

*Mayer v. Publishers Clearing House*, 205 A.D.2d 506 (2d Dep't 1994) ...................................... 10

*Miklautsch v. Sears, Roebuck and Co., No.*, 1998 WL 846122 (S.D.N.Y. Dec. 3, 1998) ............. 10

*Redd v. N.Y. State Div. of Parole*, 678 F.3d 166 (2d Cir. 2012) ...................................................... 9

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ...................................................... 9

*Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98 (2d Cir. 2011), cert. denied, 132 S. Ct. 1744 (2012) ............................................................................................................................ 9

*Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000) ................................................................. 9

*Unsecured Claims Estate Representative of Teligent. Inc. v. Cigna Healthcare, Inc. (In re Teligent Inc.)*. 324 B.R. 479 (S.D.N.Y.2005) ............................................................................................ 8

## RULES

Fed. R. Civ. P. 56(a) ..................................................................................................................... 10

## JURISDICTIONAL STATEMENT

Appellant Mary Annette Ortegon ("Ortegon"), a creditor in the above captioned bankruptcy proceeding, submits this brief in support of her appeal from the October 20, 2014 *Supplemental Order Granting the Trustee's One Hundred Ninety-Ninth Omnibus Objection to General Creditor Claims (No Liability Claims)* (the "Order") entered by the Honorable Shelley C. Chapman of the United States Bankruptcy Court for the Southern District of New York.  The Order granted the motion for summary judgment filed by James W. Giddens (the "Trustee"), as trustee for the liquidation of the business of Lehman Brothers Inc. ("LBI"), dismissing Ortegon's claim for breach of an employment contract guaranteeing her a $350,000 bonus for 2007.

## STATEMENT OF THE ISSUE

The following are the issues presented by this appeal:

1.      Whether the Bankruptcy Court erred in determining that there were no triable issues of material fact concerning Ortegon's claim for breach of employment contract.

## STATEMENT OF THE CASE

Ortegon has asserted a valid breach of contract claim against LBI, based on its failure to pay her a guaranteed $350,000 bonus as per the terms of her fully executed, written employment contract.  There are several material disputed facts surrounding Ortegon's employment at LBI. The Trustee primarily argued below that Ortegon never became an employee at LBI.  This

1

contention, however, is contradicted by statements of LBI employees at the time of Ortegon's termination, LBI's own business records and its submissions to the Financial Industry Regulatory Authority ("FINRA").  The Trustee also argued that Ortegon's employment contract was merely an offer letter which was rescinded.  The contract at issue, however, was signed and executed by both parties, and all of the conditions required of Ortegon for payment of the guaranteed bonus were met when she completed her pre-employment paperwork. The contract does not require that Ortegon remain an employee at LBI in order to receive her bonus compensation.  The only conditions placed on the bonus payment are with respect to the manner of Ortegon's termination or resignation from LBI.  The circumstances surrounding Ortegon's termination are heavily disputed.

Ortegon has maintained that she fully disclosed her participation in the Northwestern Executive MBA program throughout her pre-hire communications with LBI.  LBI asserts that she lied about the extent of her commitment, but provides no statement or affidavit from the person with whom Ortegon discussed her participation in the program with most extensively, Mohammed Grimeh, or anyone else for that matter.  There are also communications between LBI employees which demonstrate that Ortegon did indeed discuss the EMBA program throughout her interview process. The EMBA program was also listed on her resume at the time. The genuine issues of material facts surrounding Ortegon's contract, employment status, and rationale for termination preclude the grant summary judgment.  Ortegon respectfully requests that this Court reverse the Bankruptcy Court's grant of summary judgment and reinstate her claim for trial.

## STATEMENT OF FACTS

In January 2007, after a rigorous interview process lasting over the course of a month, LBI extended an offer of employment to Ortegon as a Business Chief Administrative Officer in its Fixed Income Division. Throughout the interview process, Ortegon informed LBI of her upcoming participation, beginning in January 2007, in an Executive MBA program operated by the Kellogg School of Management at Northwestern University (the "EMBA" program).[1]  When LBI extended Ortegon a job offer, it provided her with an employment contract (the "Contract"), which it prepared, and which was signed by Danielle Coppola, LBI's Vice President of Fixed Income Human Resources ("Coppola") on January 12, 2007.   In addition to specifying a yearly salary of $150,000, the Contract also provided that Ortegon would be guaranteed a "minimum bonus in the amount of $350,000, less applicable deductions, payable at the time the Firm pays its annual 2007 bonus distribution (on or about January 31, 2008)." (JA-286).[2]  Furthermore, the Contract included the following conditions upon which the bonus would and would not be payable:

> *The foregoing salary will be paid for all periods of your active employment with the Firm [LBI] in performance year 2007.* The bonus amount set forth above will be paid at the time and in the amount stated except that it will not be payable if you have failed to obtain and/or maintain in good standing all applicable licenses and registrations *or if, before the date of scheduled payment, you have resigned or have been terminated from the Firm because of misconduct, breach of Firm policies or rules, dishonesty, violation of laws or regulations, or substantial and continuing failure to perform employment duties or obligations satisfactorily.* The bonus amount set forth above may be reduced in the event of an approved leave of absence during the applicable performance year.

---

[1] LBI was a corporate sponsor of the EMBA program.
[2] References to the Joint Appendix filed on November 13, 2014 will appear as JA-__.

(JA-286) (emphasis added). The bonus provision in the Contract contained no stipulation as to Ortegon's active employment with LBI in order to maintain her eligibility to be paid the bonus. Ortegon signed the Contract on January 16, 2007.

The Contract also stated that Ortegon's offer of employment was

> conditional upon the successful completion of a background investigation, including reference, credit, criminal and other checks, as well as on your satisfactorily meeting all pre-employment requirements, including passing a pre-employment drug screen and producing documentation to verify your identity and eligibility to work in the United States. This also means that you must have and maintain in good standing all applicable licenses and registrations.

(JA-287) Ortegon completed all of these requirements when, also on January 16, 2007, she went into LBI's offices to sign the Contract and fill out her pre-employment paperwork. LBI's own records show that she completed all that requirements on its "Pre-Employment Audit Sheet."[3] It was at this point that that she first discussed her participation in the EMBA with Coppola, after having extensively detailed her participation in the program during the interview process, including telling Mohammed Grimeh LBI's Managing Director, Head of Emerging Markets Business ("Grimeh") and the individual who was Ortegon's immediate superior, about the week-long EMBA orientation.

On January 18, 2008, Ortegon went into a meeting with Coppola and Grimeh and was informed that her job offer and employment contract had been rescinded supposedly because she had not been forthcoming about her participation in the EMBA program, despite the fact that Ortegon had offered to defer her enrollment in the program after Coppola had raised questions about it.

Ortegon suspected that she was terminated because LBI discovered that she had filed charges with the United States Equal Employment Opportunity Commission ("EEOC") against

---

[3] The Pre-Employment Audit Sheet and all of the pre-employment paperwork produced by LBI is included in the Joint Appendix at JA-322 – JA-337.

two prior employers, SBC Capital Markets, Inc. and HSBC Securities, for gender discrimination. In 2008, Ortegon filed a charge of retaliation with the EEOC against LBI based on her suspicions.

LBI employees attempted to remove Ortegon from LBI's employment records. Shari Kroningold ("Kroningold"), a LBI human resources employee, sent an email on January 17, 2007, the evening before Ortegon's meeting with Grimeh and Coppola which stated: "Mary Ortegon will not be starting tomorrow. Not sure what you do to 'unhire' employees but right now we do not have a start date." (JA-304).[4] (emphasis added). Krongingold also sent an email to Coppola the next day stating: "John pushed Mary's [Ortegon] start date back since she was already in PS. When/if She starts, he will re-enter a start date or if she never starts we will term [terminate] her in the system." (JA-303). She then sent a follow up to her first email on the same day asking "Were you able to speak with Donna about Mary Ortegon? She's the employee that is in PS but never started so we do not want her to be on our pipeline or come up as a hire then a term [termination]." (JA-305)(emphasis added). She received a response from John Cannady Jr. ("Cannady") that evening informing her that "We are going to term [terminate] her and let the term [termination] feed to LDAP and then we will delete the ID altogether. I will let you know once I have started to get the ball rolling on her case." (JA-305).

Ortegon's employment and termination from LBI is also part of her record in official Financial Industry Regulatory Authority ("FINRA") documentation. "LEHMAN BROTHERS INC (7506)" is listed in Ortegon's employment history with her start date and end date listed as

---

[4] Select emails authored by Kroningold and Cannady produced by LBI are included in the Joint Appendix (JA-302 – JA-305).

"1/17/2007." (JA-315 – JA-316).[5]  The only way this was recorded by FINRA was if LBI filed paperwork showing her start and end date as January 17, 2007.

There is also ample evidence that Ortegon disclosed her involvement in the EMBA program to LBI during her pre-hire interview process. Ortegon clearly listed her involvement in the EMBA program on her resume (JA-297) and in her application for LBI's Encore Program (JA-290), a recruitment program for LBI. A series of emails between Coppola and Mary Pat Archer ("Archer"), a LBI Managing Director who interviewed Ortegon, demonstrate that Coppola mistakenly presumed that Ortegon hid her involvement in the EMBA program.[6] On January 16, 2007, Coppola asked Archer if they could discuss the possibility of putting Ortegon on a flex schedule. (JA-300). That same day, Archer responded "I didn't ask her about Kellogg [EMBA program] bc I assumed she was filling her time while out… I had it in my notes but never got to asking." (JA-300).

In a follow up email, Archer asks Coppola if LBI should be paying Ortegon's tuition. (JA-299). Coppola responded on January 17, affirmatively, saying that LBI is paying for others. She then raised a concern asking, "why didn't she [Ortegon] mention it to us before she accepted the offer? Am I being a stickler?" (JA-299).  Archer replied and clarified that Ortegon did have her involvement in the program on her resume. (JA-299). However, in an email on the evening of January 17, Coppola informs Archer that LBI was "going to postpone her start date by one day so that Mo [Grimeh] and I can meet with her tomorrow to review exactly what her school commitment is and to better understand why she didn't inform us about the program during her interview process." (JA-301). Coppola clearly still believed that Ortegon did not mention her involvement in the EMBA program at all, despite Archer's previous statements that Ortegon had

---

[5] The FINRA documentation is included full in the Joint Appendix (JA-306 – JA-321).
[6] The series of emails between Coppola and Archer are included in the Joint Appendix (JA-298 – JA-301).

mentioned it. Ortegon also contests Coppola version of what transpired during the interview process with LBI. Ortegon provided an affidavit to the EEOC in connection with her charge of retaliation against LBI, which was submitted as part of the record before the Bankruptcy Court below, in which she recounted speaking about her involvement in the EMBA program with LBI executives, including her hiring manager, throughout the interview process.[7]

Specifically, Ortegon detailed how she met with Grimeh on December 2006. They discussed at length LBI's plans to expand business in Brazil. Ortegon noted that this would work well with her EMBA program, which she described to him as a "monthly extended weekend Program based in Miami made up of a group of Latin American executives." (JA-273) (Ortegon Aff. ¶ 21). She discussed her enrollment in the EMBA program as part of her educational background in several of her interviews, as well as providing her resume, which was clearly listed as "Kellogg/Northwestern Executive MBA *Winter 2007-Accepted,*" which she provided to LBI. (JA-297; JA-274) (Ortegon Aff. ¶ 24). Scott Kimmel ("Kimmel") specifically asked how Ortegon would perform her duties and attend the EMBA program. Ortegon responded that the program was designed for executives who work full time and that the she was prepared to use vacation and personal days to attend. Kimmel expressed his approval and moved on to discuss her professional background. (JA-274) (Ortegon Aff. ¶ 25).

On January 11, 2007, Grimeh called Ortegon to offer her the position. Grimeh and Ortegon made arrangements to meet before his planned trip to London the week of January 22, 2007. Ortegon reminded him that her EMBA program was beginning that same week and that it would make sense for Ortegon to travel directly to Brazil from Miami to meet with the team there. They agreed to meet on January 18, 2007 to discuss her schedule. (JA-276) (Ortegon Aff. ¶ 30).

---

[7] Ortegon's Affidavit filed with the EEOC is included in full in the Joint Appendix (JA-265 – JA284).

Ortegon met with both Coppola and Grimeh on January 18, 2007.   Grimeh questioned why Ortegon did not talk enough about her involvement in the EMBA program. Ortegon reminded him that she discussed it during their interview and when he called to offer her the job earlier in January. He acknowledged that she had discussed it with him, but that he was busy and that he had forgotten about it. Ortegon, who had already offered to defer the program, apologized for any confusion and suggested they move on. (JA-281) (Ortegon Aff. ¶45).   She also emailed Coppola later that day, reiterating that she would "wait to do my EMBA when it works both for Lehman and for me." (JA-76). This was insufficient for LBI.  Grimeh called Ortegon on January 19, 2007 to inform her that LBI was rescinding its offer. (JA-282) (Ortegon Aff. ¶ 48).  She also received a letter, dated January 19, 2007, indicating that LBI was rescinding the offer and effectively terminating her employment. (JA-165).

## STANDARD OF REVIEW

"On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. The Court Reviews a bankruptcy court's grant of summary judgment *de novo* "because the determination that there are no genuine issues of material fact is a legal conclusion." *Unsecured Claims Estate Representative of Teligent. Inc. v. Cigna Healthcare, Inc. (In re Teligent Inc.)*. 324 B.R. 479, 487 (S.D.N.Y.2005)(citing *FDIC v. Giammettei*, 34 F.3d 51, 54–55 (2d Cir.1994)).

A grant of summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "burden of demonstrating that no material fact exists lies with the

moving party." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011), cert. denied, 132 S. Ct. 1744 (2012).  When considering whether any material facts exist "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he evidence of the non-movant is to be believed…and the court must disregard all evidence favorable to the moving party that the jury is not required to believe." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (citations and quotations omitted).

As a result,"[s]ummary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit," or "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility." *Id*. (citations and quotations omitted). "In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict, i.e., it is quite clear what the truth is." *Id*. (citations and quotations omitted).

## ARGUMENT

### I.     Ortegon and LBI Executed a Valid Employment Contract

Ortegon has alleged the LBI breached the employment contract which was executed by both parties on January 16, 2007.  "To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).  The formation of a valid contract requires an "offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004).

As described above, LBI offered Ortegon employment upon the terms specified in the Contract. Ortegon completed the pre-employment requirements and accepted on January 16.

In his brief before the Bankruptcy Court, the Trustee cited *Miklautsch v. Sears, Roebuck and Co., No.*, 1998 WL 846122, at *1 (S.D.N.Y. Dec. 3, 1998) and *Mayer v. Publishers Clearing House*, 205 A.D.2d 506 (2d Dep't 1994) for the proposition that "[r]escission of an offer of at will employment, even after the offer has been accepted, does not give rise to breach of contract." (JA-153). However, in both of those cases, the plaintiffs sued for breach of contract because their offers had been rescinded and not because any specific terms of the offer letters had been violated.  Ortegon does not dispute that her employment at LBI was at will employment, nor does she dispute that LBI had the ability to terminate her employment; however, LBI became obligated to pay Ortegon her bonus as per the terms of the Contract. Judge Chapman, in her colloquy with counsel during argument on the Trustee's motion, referred to the Contract as an offer letter which was rescinded by LBI. (JA-488:5-6).  Judge Chapman also specifically mentioned the portion of the Contract which states that Ortegon's "employment by the firm is for no fixed term and either you or the firm may terminate the employment relationship at any time for any reason subject to any applicable notice requirement." (JA-487:15-18).

However, as counsel pointed out in oral arguments (JA-481:18 – JA-482:9), Ortegon completed all of the conditions required to fulfill the offer of employment and thus LBI became bound to honor the terms of the agreement, specifically those concerning the bonus payment. Ortegon is not, and has never tried to refute the assertion that the Contract was an agreement for at will employment and as such, LBI was within its rights to terminate her. However, LBI also

assumed obligations to Ortegon as part of the employment agreement for paying a bonus, which should now be honored.

In *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22  (S.D.N.Y. 2010), the plaintiff sued for breach of contract  in part on the grounds that the Omnicare, the defendant,  breached the terms in her offer letter detailing her severance pay in the event of her termination.  As in Ortegon's case, the offer letter did not constitute a contract of employment for any specified length of time. The defendant argued that this meant that the offer letter was not an employment agreement. The Court found this argument unpersuasive.

> This phrase does not mean that the Offer Letter is not a contract; rather, it means that Arakelian [plaintiff]  will be an at-will employee "subject to discharge at any time." *Leibowitz v. Bank Leumi Trust Co. of N.Y.*, 152 A.D.2d 169, 174, 548 N.Y.S.2d 513 (N.Y.App. Div. 2d Dep't 1989). By signing the Offer Letter, Arakelian entered into a valid and enforceable contact with NeighborCare, albeit a valid and enforceable at-will employment contract. *See Broyles v. J.P. Morgan Chase & Co.*, No. 08 Civ. 3391(WHP), 2010 WL 815123, at *3 (S.D.N.Y. Mar. 8, 2010) ("However, reference to an employment at will policy does not bar the Offer Letter from operating as a valid contract."); *JCS Controls, Inc. v. Stacey*, 57 A.D.3d 1372, 1373, 870 N.Y.S.2d 679 (N.Y.App. Div. 4th Dep't 2008) ("We further agree with the [lower] court, however, that the terms set forth in the March 1998 employment agreement, which was signed by plaintiff's president, are binding on plaintiff [employer] despite defendant's [employee] status as an at-will employee*."); see generally Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir.2000) ("In Leonelli, we rejected a defendant's argument that because the plaintiff was an at-will employee, he could not state a breach of contract claim for denial of benefits." (citing *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1196 (2d Cir.1989))).

*Arakelian*, 735 F. Supp.at  32.

The Trustee also argued that Ortegon failed to perform her employment duties or obligations satisfactorily because she never began her employment at all.  This argument is an attempt to invalidate the Contract by claiming that Ortegon did not fulfill the terms required under the agreement.  However Ortegon was never given the opportunity to perform any employment duties or obligations so it is unclear how she could have failed to perform in a

substantial and continuing manner as required by the Contract. Furthermore, LBI was

responsible for the nonoccurrence of this condition precedent when it retracted the Contract.

> Ordinarily, if the failure of a condition precedent is raised by a party, the party claiming breach of contract has the burden of proving the condition was satisfied. This general principle, however, is subject to the well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself.

*Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 348 (S.D.N.Y. 2013) (citations and

quotations omitted); *See also Amies v. Wesnofske*, 255 N.Y. 156, 163, 174 N.E. 436 (1931)  ("It is

as effective an excuse of performance of a condition that the promisor has hindered performance

as that he has actually prevented it.").

## II.      Ortegon Was a LBI Employee

The Trustee initially objected to Ortegon's claim on the basis that her termination from

LBI and its failure to pay her bonus did not constitute a breach of contract. Specifically, the

Trustee articulated as its reason for objection to Ortegon's claim that: "The employment actions

that are the subject of this claim were lawful, as claimant's employment was at will and in

securing a job offer, claimant failed to disclose that she would require substantial time off to

pursue a graduate degree in a different state." (JA-36). In his motion for summary judgment, the

Trustee's argument shifted and he argued that because of the supposed revelation that Ortegon

had to attend her orientation, something which she had already disclosed to Grimeh before being

offered a position, LBI rescinded her offer of employment and Ortegon never began her

employment at LBI at all.

This assertion is belied by LBI's staff who attempted to manipulate LBI's records in order

to prevent Ortegon from appearing as an employee in firm records.  As recounted above,

Kroningold referred to Ortegon as an LBI employee twice. She informed someone named

12

Cannady that LBI would prefer that Ortegon not appear as a hire or employee in LBI's systems. LBI also did not want her to appear as a terminated employee. However, it appears that it was too late; Ortegon was an LBI employee and therefore had to be terminated. Cannady informed Kroningold that LBI would have to terminate Ortegon in the system and delete her identification. LBI also submitted documentation to FINRA which proceeded to register Ortegon as a LBI employee for one day, January 17, 2007.  Ortegon's Contract with LBI was for at will employment, meaning that LBI had the ability to terminate Ortegon at any time. However, per the terms of the Contract if LBI terminated Ortegon's employment, LBI would still be obligated to pay Ortegon her contractually obligated bonus. LBI knew this, and tried to alter its records to prevent Ortegon from appearing as an employee in a transparent attempt to deny Ortegon her bonus.

Judge Chapman asserted that Ortegon was never a LBI employee.  "She was never an employee. She never worked for LBI, notwithstanding the [FINRA] screenshot." (JA-488:9-10). However, it was LBI which terminated Ortegon without cause after Ortegon had completed the requirements of the employment contract and officially became employed by LBI, and prevented Ortegon from performing the work for which she was hired.

### III.    Ortegon Is Due Bonus Compensation Per the Terms of the Contract

The terms of Ortegon's Contract with LBI do not require active employment in order for Ortegon to receive her due bonus compensation.  The only relevant requirements that the bonus section contains deal with the manner or cause of Ortegon's termination and there is substantial evidence that demonstrates that Ortegon was not terminated on grounds that would allow or release LBI from its contractual obligation to pay Ortegon the $350,000 bonus.

### A.  The Contract Contains No Active Employment Requirement For The Bonus

As detailed above, Ortegon was  guaranteed a "minimum bonus in the amount of $350,000, less applicable deductions, payable at the time the Firm pays its annual 2007 bonus distribution (on or about January 31, 2008)." (JA-286).  The bonus does specifically become payable on January 31, 2008, but nothing in the contract states that Ortegon must be employed in order to receive it.  By contrast, the salary provision immediately following this portion of the contract states, "the foregoing salary will be paid for all periods of your **active employment** with the Firm in the performance year 2007." (JA-286) (emphasis added).  The conditions on the bonus payment contain no such requirement.

> The bonus amount set forth **above will be paid at the time and in the amount stated except that it will not be payable if you have failed to obtain and/or maintain in good standing all applicable licenses and registrations or if, before the date of scheduled payment, you have resigned or have been terminated** from the Firm because of misconduct, breach of Firm policies or rules, dishonesty, violation of laws or regulations, or substantial and continuing failure to perform employment duties or obligations satisfactorily. The bonus amount set forth above may be reduced in the event of an approved leave of absence during the applicable performance year.

It is clear from the plain language of the contract that Ortegon is due a minimum bonus in the amount of $350,000 on January 31, 2008, unless she fails to obtain or maintain her applicable licenses or registrations or *if before the date of the scheduled payment* she resigned or was terminated for one of the enumerated reasons.

The language of the Contract contemplates the payment of a bonus "before the date of the scheduled payment" and places the restrictions of a resignation or a termination for the specified "for cause" reasons on the due pay out.  If the bonus payment was only payable on January 31, 2008 as long as Ortegon was actively employed, then this would render the restrictions on any payment "before the date of the scheduled payment" superfluous.  LBI would be within its rights

14

to withhold a bonus payment no matter the circumstances surrounding Ortegon's departure. Such a construction runs afoul of basic principles of contract interpretation.

> We disfavor contract interpretations that render provisions of a contract superfluous. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir.2001) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094–95 (2d Cir.1993)) ("In determining whether a contract is ambiguous, a court must look at 'the entire integrated agreement,' to 'safeguard against adopting an interpretation that would render any individual provision superfluous.' "); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992) (quoting *Garza v. Marine Transport Lines*, Inc., 861 F.2d 23, 27 (2d Cir.1988)) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.' "); *Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co.*, 94 N.Y.2d 398, 404, 706 N.Y.S.2d 66, 69–70, 727 N.E.2d 563, 566–67 (2000) ("Bank Leumi's interpretation would render the second paragraph superfluous, a view unsupportable under standard principles of contract interpretation.")

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002).

Judge Chapman stated that the "entire tenor of the contract is that – is that this was proposed compensation for work that would be performed." (JA-488: 3-5) However, this attempt to discern the tenor of the contract is belied by the plain and unambiguous actual language as was written by LBI.    Additionally, Judge Chapman felt that providing Ortegon relief per the terms of her contract would put her in a much better provision than most of the employee-creditors who worked for LBI.

> Your claim is one for a bonus for work that was never performed. Your claim is one for a cash payment for a bonus that by its terms was at the discretion of management not entirely payable in cash. You're asking for an extraordinary, extraordinary type of relief. You're asking for Ms. Ortegon to be treated better than employees who have worked at Lehman Brothers for years and years and years and lost everything because their bonuses year in and year out for work they actually performed was paid to them  in the form of equity. It would be wrong…

(JA-484:4-15). While it is unfortunate that many former LBI employees will not receive their expected compensation due to LBI's mismanagement and bankruptcy, that does not alter the

terms of Ortegon's contract with LBI, which is clear and contains no active employment requirement tied to the payment of her bonus.[8]


### B.  Ortegon Was Not Terminated For Cause

Although not dealt with at oral arguments, the Trustee has argued that Ortegon was terminated for misconduct or dishonesty which would prevent her from receiving her bonus due to her alleged failure to inform LBI of her participation in the EMBA  program.  However, as described in full detail above, Ortegon was forthright about her planned participation in the EMBA program from the offset.  The only evidence the Trustee uses to support his assertions to the contrary is an email between Deborah Millstein and Pamela J. Tibbets, LBI employees, which was also "cc'd" to Coppola and Marla Hassner.  This document was attached as an exhibit to the Declaration of Meaghan Gragg. The email constitutes inadmissible hearsay and cannot form the basis of a motion for summary judgment.

> Rule 56(c) (4) of the Federal Rules of Civil Procedure  provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

---

[8] There also remains a genuine issue of fact as to the structure or composition of Ortegon's bonus.  Per the terms of her Contract

> a portion of your 2007 and future years' total compensation ( combined base salary, bonus, and other compensation) will be payable in conditional equity awards (restricted stock unites, options, and/or other equity based awards) pursuant to the Firm's Equity Award Program as then generally in effect for employees with your position and corporate title. The terms and conditions of the Equity Award Program, including terms and conditions relating to vesting, exercisability, and forfeiture, will be established by the Firm from time to time in its discretion.

(JA-286). Regardless, only an unspecified portion of Ortegon's bonus could have been paid in conditional equity awards.  Furthermore, at the time of Ortegon's termination stock in LBI would have had considerable value.

*Arneauld v. Pentair, Inc.*, 2012 WL 5932956 at *14  (E.D.N.Y. Nov. 26, 2012) (citing *Patterson v. County of Oneida, New York*,  375 F.3d 206, 219 (2d Cir.2004)).  Ms. Gragg is an attorney for the Trustee in the liquidation of LBI, but has no personal knowledge of what transpired between Ortegon and LBI in the relevant time frame.

Furthermore, the assertion that Ortegon did not disclose the time commitments involved in her EMBA program is a heavily contested fact in this matter.   Ortegon explicitly listed her involvement in the EMBA program on her resume and in her application Encore Program, a recruitment program for LBI.  A series of emails between Coppola and Archer reveal that LBI personnel who interviewed Ortegon were aware of the program.  Coppola however continued under the impression that Ortegon had not informed LBI of her participation in the EMBA program despite having conversations with Archer in which Archer was clear that Ortegon had included it in her resume.  Ortegon has also submitted an affidavit in connection with her complaint to the EEOC which describes the various conversations she had with other interviewers regarding the EMBA  program and the lengths at which she discussed the program with Grimeh, her soon to be supervisor.

LBI has not submitted any affidavits or statements by Grimeh, the person with whom Ortegon discussed her EMBA program the most, contradicting Ortegon's sworn testimony.  The extent to which Grimeh and Ortegon discussed her involvement in the EMBA program is still an outstanding genuine issue of material fact and LBI has relied on inadmissible hearsay evidence that in any event does not definitively establish Ortegon's failure to disclose the details of her participation in the EMBA program.  The different versions between the parties of what transpired in 2006 and 2007 can be explored through testimony and cross-examination of

17

witnesses.  Summary judgment at this stage, when the facts have not been established, and the Court is required to draw all inferences in favor of the non-movant, is inappropriate.

## <u>CONCLUSION</u>

The October 20, 2014 Order of the Bankruptcy Court granting summary judgment to the Trustee should be reversed and this case should be remanded for further proceedings.

Dated:         New York, New York
               November 13, 2014

                                        Respectfully submitted,


                                        By:/s/ Ethan A. Brecher_____

                                        Ethan A. Brecher
                                        Law Office of Ethan A. Brecher, LLC
                                        600 Third Avenue, 2nd Floor
                                        New York, NY 10016
                                        Phone: (646) 571-2440
                                        Fax: (888) 821-0246
                                        Email: ethan@ethanbrecherlaw.com
                                        *Attorney for Mary A. Ortegon*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on NOVEMBER 13, 2014, I caused to be electronically filed

the foregoing Brief of the Appellant by using the CM/ECF system, which will send a notice of

electronic filing to all counsel of record who have registered to receive notices from the court

under the CM/ECF system.

Respectfully submitted,

By: /s/ Ethan A. Brecher

Ethan A. Brecher
Law Office of Ethan A. Brecher, LLC
600 Third Avenue, 2nd Floor
New York, NY 10016
Phone: (646) 571-2440
Fax: (888) 821-0246
Email: ethan@ethanbrecherlaw.com
*Attorney for Mary A. Ortegon*

19